1
2
3
4
5
6
7
8                    IN THE UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   PHYSICIANS COMMITTEE FOR                No. C 05-04093 CRB
     RESPONSIBLE MEDICINE et al.,
12                                           **MEMORANDUM AND ORDER**

                     Plaintiff,

     v.

     UNITED STATES ENVIRONMENTAL
     PROTECTION AGENCY,

                     Defendant.
     _____/

18        Plaintiffs filed this Administrative Procedure Act ("APA") action to challenge the

19   alleged failure of the Environmental Protection Agency ("EPA") to implement a pesticide

20   testing program.  Now pending before the Court are the parties' cross-motions for summary

21   judgment.  After carefully considering the papers filed by the parties, and having had the

22   benefit of oral argument, the Court concludes that plaintiffs have not proven that they have

23   standing to prosecute this lawsuit.

24                                **BACKGROUND**

25        The EPA regulates pesticides under the Federal Food, Drug and Cosmetic Act

26   (FDCA), 21 U.S.C. sections 301 et seq, and the Federal Insecticide, Fungicide and

27   Rodenticide Act ("FIFRA"), 7 U.S.C. sections 136 et seq.  Under FIFRA no person can sell a

28   pesticide that is not registered by the EPA.  7 U.S.C. § 136a(a).  The EPA can register a

*United States District Court*

*For the Northern District of California*

**United States District Court**

For the Northern District of California

1  pesticide only after it determines that the pesticide "will not generally cause unreasonable

2  adverse effects in the environment."  7 U.S.C. § 136a(c)(5)(D).

3          The FDCA "provides for the regulation of the presence of pesticides in agricultural

4  commodities by empowering the EPA to establish 'tolerances' setting the maximum

5  allowable levels of pesticide residue in foods." American Farm Bureau v. EPA, 121

6  F.Supp.2d 84, 88 (D.D.C. 2000).  "Before any agricultural commodity containing pesticide

7  residue can be sold or distributed, a tolerance that meets statutory safety standards must be

8  adopted by the EPA for that pesticide." Id.  "Foods containing pesticide residues for which

9  no tolerance has been set or containing a pesticide residue level greater than the tolerance

10  established by the EPA are considered 'unsafe' and 'adulterated' and may not be legally

11  moved in interstate commerce." Id. (citing 21 U.S.C. § 331(a), 342(a)(2)(B), 346a(a)).  The

12  EPA "may establish an exemption from the tolerance for a pesticide chemical residue in or

13  on food if the agency determines that it is safe." Id. at 88-89 (citing 21 U.S.C. § 346a(c)(1)-

14  (2)).   In 1996 Congress passed the Food Quality Protection Act ("FQPA").  The FQPA

15  amended the EPA's regulation of pesticides by, among other things, "increasing the number

16  of factors that the EPA must consider in establishing a tolerance or exemption." Id. at 89

17  (citing 21 U.S.C. § 346(b)(2)(A)(ii)).  It also set a series of "deadlines by which EPA was

18  required [to] reassess the tolerances and exemptions to tolerances for 9,728 pesticide uses."

19  Natural Resources Defense Council  v. EPA, 2001 WL 1221774 * 1 (N.D. Cal. Sep. 24,

20  2001) (NRDC).  Of most significance to this lawsuit, the Act required the EPA to "develop"

21  a pesticide screening program by August 3, 1998 "to determine whether certain substances

22  may have an effect in humans that is similar to an effect produced by naturally occurring

23  estrogen, or such other endocrine effect, 21 U.S.C. § 346a(p)(1), and to "implement" the

24  program by August 3, 1999.  Id. § 346a(p)(2).  This Memorandum and Order refers to the

25  testing program as the "Estrogenic Substances Testing Program" or "ESTP."

26  **A.      The First Litigation**

27          Various non-profit organizations, including the Natural Resources Defense Council

28  ("NRDC"), filed suit in August 1999 alleging that the EPA had failed to meet the FQPA's

2

United States District Court

For the Northern District of California

1  tolerance-reassessment deadlines.  NRDC, 2001 WL 1221774 at *2.  They subsequently

2  amended their complaint to allege, among other things, that the EPA had failed to meet the

3  FQPA's deadlines for implementing the ESTP.

4        The non-profit organizations People for the Ethical Treatment of Animals ("PETA")

5  and the Physicians Committee for Responsible Medicine ("Physicians Committee")

6  subsequently intervened as plaintiffs.  Their complaint was directed solely to the ESTP and

7  alleged that: (1) the EPA had failed to adopt the pesticide screening program required by the

8  FQPA, and (2) had failed to appropriately validate the tests used in the program because it

9  had decided to subject tests that do not use laboratory animals to a more rigorous validation

10  process than that used for tests that involve animals.  Id. at *2.

11        The NRDC plaintiffs and the EPA subsequently entered into a settlement.  Among

12  other things, the settlement provided that the EPA would be bound by a consent decree, the

13  settling plaintiffs would dismiss their cause of action regarding the ESTP, and the EPA

14  would enter into a private settlement agreement requiring it to use its best efforts to

15  implement the ESTP.  According to the Amended Complaint in this action, the settlement

16  agreement requires the EPA to use best efforts to implement certain parts of the ESTP by

17  dates certain, all of which have passed.  Amended Complaint ¶ 43.

18        The intervening plaintiffs, PETA and Physicians Committee, filed an objection to the

19  proposed consent decree.  The court overruled the objections and approved the consent

20  decree.  NRDC, 2001 WL 1221774 at *22.

21        The intervening plaintiffs proceeded with their complaint-in-intervention.  The

22  amended complaint-in-intervention included five counts: (i) the EPA has failed to validate

23  the "full range of necessary screens and test" for an effective ESTP; (ii) the EPA improperly

24  expanded the screening program beyond pesticides and estrogenic effects; (iii) the EPA

25  failed to consult with Health and Human Services; (iv) the EPA has failed to develop and

26  validate protocals to reduce animal distress or reduce or eliminate the use of animals in

27  testing; and (v) the EPA has discriminated against animals by subjecting animal tests to a

28

different level of acceptance than non-animal tests.  <u>PETA v. Whitman</u>, 99-0371 WHA, December 12, 2001 Order at 5; Amended Complaint ¶ 8.

The EPA and the NRDC moved to dismiss.  The court granted the motions and dismissed the claims on their merits.  <u>PETA v. Whitman</u>, 99-0371 WHA, December 12, 2001 Order.  Plaintiffs did not appeal.

**B.     The Second Litigation**

The intervening plaintiffs subsequently filed a rulemaking petition with the EPA under section 533 of the Administrative Procedure Act ("APA").  The petition alleged that the EPA had failed to "implement" the ESTP as required by 21 U.S.C. section 346a(p)(2).  The petition sought to limit the ESTP to the testing of endocrine effects in *humans*; the EPA had expanded the program to include pesticides' endocrine effects in animals as well as humans.  Amended Complaint ¶ 37.  In 2005, while the petition was pending, PETA and Physicians Committee filed this action.  The EPA subsequently denied the rulemaking petition and, in response, plaintiffs amended their complaint.  Plaintiffs now make two claims.

First, they allege that the EPA has failed to "implement" the ESTP by the statutory deadline.  They contend that "[i]mplementation would require EPA to conclude the validation process for all screens and tests and then direct manufacturers as to which screens and tests must be performed, and in which order."  Amended Complaint ¶ 48.  In the second count they contend that the EPA's denial of their rulemaking petition was arbitrary and capricious.

The parties have filed cross-motions for summary judgment.  Plaintiffs argue that the EPA has failed to implement the ESTP and therefore summary judgment must be granted.  The EPA cross-moves for judgment on the grounds that (1) plaintiffs lack standing; (2) plaintiffs' claims are barred by the statute of limitations; and (3) the EPA has implemented the program.

Also pending before the Court is the NRDC's motion to intervene in this action.  As explained above, they previously sued the EPA for, among other things, failing to implement

**United States District Court**

**For the Northern District of California**

1  the ESTP.  That claim resulted in a settlement agreement that provides for, among other

2  things, informal dispute resolution should the NRDC believe that the EPA is not complying

3  with its obligations under the agreement.  The NRDC is currently pursuing such informal

4  dispute resolution.  Accordingly, it does not seek to intervene on the question of liability;

5  rather, it seeks to intervene on the question of remedy should the Court find that the EPA has

6  failed to fulfill its statutory obligations.  The NRDC is concerned that the relief the plaintiffs

7  seek here, namely limiting the testing on animals, would unduly narrow the ESTP and

8  interfere with the EPA's ability to comply with its obligations under its settlement with the

9  NRDC.

**DISCUSSION**

**A.    Standing**

**1.    Legal requirements**

The EPA moves for summary judgment on the ground that plaintiffs have not proven

that they have standing to pursue their APA challenge to the EPA's alleged failure to

implement the ESTP.

"As with any statute, there are both constitutional and prudential dimensions to

standing under the APA.  Article III's 'case or controversy' requirement dictates an

'irreducible constitutional minimum' to bring suit in federal court."  Graham v. Federal

Emergency Management Agency, 149 F.3d 997, 1001 (9th Cir. 1998).  The constitutional

requirements consist of three elements: (1) an injury in fact that is (a) concrete and

particularized, and (b) actual or imminent, not conjectual or hypothetical; (2) a causal

connection between the injury and the defendant's conduct; and (3) a likelihood that the

injury will be redressed by a favorable decision.  See Ocean Advocates v. U.S. Army Corps

of Engineers, 402 F.3d 846, 859 (9th Cir. 2005) (citing Friends of the Earth v. Laidlaw, 528

U.S. 167, 180 -81 (2000)).  "There also is a significant prudential component of the APA's

standing inquiry.  Plaintiffs must show that they fall within the 'zone of interests' to be

protected or regulated by the underlying statute in question."  Graham, 149 F.3d at 1001.

**United States District Court**
For the Northern District of California

1  Plaintiffs bear the burden of establishing standing.  Central Delta Water Agency v.

2  United States, 306 F.3d 938, 947 (9th Cir. 2002).

3  The elements of standing are "not mere pleading requirements."  Rather, they
   are an "indispensable part of the plaintiff's case," and accordingly must be
4  supported at each stage of litigation in the same manner as any other essential
   element of the case.  Thus, at the summary judgment stage the plaintiffs need
5  not establish that they in fact have standing, but only that there is a genuine
   question of material fact as to the standing elements.

6

7  Id.

8        **2.        Plaintiffs' standing evidence**

9  The individual plaintiffs and their children are vegetarians who eat plant-based foods.

10 While they attempt to eat foods that are not treated with chemicals or pesticides, that is not

11 always possible.  They allege that because the EPA has not implemented the ESTP, the EPA

12 has not restricted pesticide manufacturers and food producers from using dangerous

13 pesticides which have endocrine-like effects.[1]  "Therefore these pesticides are still being used

14 in the food supply, and every time individual Plaintiffs ingest these foods, they are also

15 ingesting the residue from the pesticides, putting themselves, their children, and any children

16 they may have in the future at risk of endocrine disorders."  Plaintiffs' Opposition at 14.

17 The only evidence plaintiffs cite to support their allegation of harm is a reference to a quote

18 in the EPA's cross-motion for summary judgment.  That footnote quotes from a scientific

19 paper that is not in the record:

20 Recent scientific research indicates that synthetic chemicals may disrupt the
   human endocrine system, possibly causing decreased fertility, malformed
21 reproductive organs, increased levels of cancer in reproductive organs,
   impaired fecal development, and neurological, thryroid, and immune disorders.
22 These endocrine disrupting chemicals ("EDCs'"), which mimic, block, or
   otherwise interfere with normal hormonal signals, are found in pesticides.

23

24 EPA's Cross-Motion for Summary Judgment at 3 n.1.  Plaintiffs offer no other evidence to

25 support their allegations of risk of harm; instead, they rely on Congress's adoption of the

26 ─────────────

27       [1]  See 21 U.S.C. § 346a(6) ("In the case of any substance that is found, as a result  of
   testing and evaluation under this section, to have an endocrine effect on humans, the
28 Administrator shall, as appropriate, take action under such statutory authority as is available to
   the Administrator, including consideration under other sections of this chapter, as is necessary
   to ensure the protection of public health").

FQPA and its testing requirements as evidence that pesticides pose an endocrine risk to humans.

### 3.    Analysis

Plaintiffs have not met their burden of producing evidence sufficient to create a genuine dispute as to whether they satisfy the standing elements.  See Central Delta Water Agency, 306 F.3d at 947.

First, they have not submitted evidence sufficient to create a genuine dispute as to whether they have suffered an injury in fact.  "An injury in fact is an invasion of a legally protectable interest which is both 'concrete and particularized,' as well as 'actual or imminent, not conjectural or hypothetical.'"  Id.  "In suits against the government, therefore, when plaintiffs have not already suffered a tangible loss at the government's hands, they must establish a substantial likelihood that they 'personally' will be injured in the future by the government's policy."  Graham,149 F.3d at 1002;  see also Central Delta Water Agency, 306 F.3d at 947, 948 (holding that a significant risk of injury can constitute injury in fact).

Assuming that plaintiffs' alleged injury–threatened harm from pesticides--is "concrete and particularized," they have nonetheless not established that it is also "actual or imminent, not conjectural or hypothetical."

In Graham, a typhoon struck the Federal States of Micronesia ("FSM").  The FSM, by compact with the United States, is eligible for disaster relief funds from the United States. government, through programs administered by the Federal Emergency Management Agency ("FEMA").  The program itself was administered by FSM: FEMA pays money to the state, and the state pays funds to its citizens whom it determines are eligible for disaster relief under FEMA's rules.  Id. at 1000.  FEMA eventually terminated the program with a number of claims approved by FSM still unpaid and a number of others still pending before FSM for decision.  Id.  Plaintiffs, residents of FSM, sued FEMA for violation of the APA seeking an order requiring FEMA to provide the funds necessary to pay their claims.

FEMA moved to dismiss for lack of standing.  The Ninth Circuit held that those plaintiffs whom FSM had not yet determined were eligible for disaster relief (or, more

**United States District Court**

For the Northern District of California

1   precisely, plaintiffs whose appeals had not been decided) had not shown injury in fact: "Any

2   right to such funds depends entirely on whether the FSM, which is not a party to this suit,

3   would reverse its initial determination and grant their appeals.  Hence, it is 'purely

4   speculative' whether an injunction from this court would ever result in these plaintiffs

5   receiving individual and family grants."  149 F.3d at 1002.

6          As with the plaintiffs in Graham, plaintiffs' alleged injury here is purely speculative.

7   As defendants point out, plaintiffs do not identify a single pesticide that they contend has

8   unreasonable endocrine effects and thus would be banned if the EPA actually began the

9   testing program.  They do not even identify what an unreasonable endocrine effect would be.

10  Nor do they identify any particular foods that are treated with these unidentified pesticides.

11  Any alleged harm from the EPA's failure to begin testing pesticides is therefore not actual or

12  imminent but is instead "conjectual and hypothetical."

13         The only evidence of harm provided by plaintiffs is equivocal: the quote from the

14  EPA's brief merely states that certain chemicals "may" disrupt the human endocrine system

15  and that such chemicals are found in pesticides.  This is hardly evidence that all pesticides, or

16  pesticides used in foods that plaintiffs eat, or even any pesticides, are "substantially" likely to

17  harm the plaintiffs if the plaintiffs eat foods treated with such pesticides at the current

18  tolerance levels.  See Graham,149 F.3d at 1002.  Nor is this evidence sufficient to establish a

19  "credible" risk that plaintiffs will be harmed if they eat non-organic produce.  See Central

20  Delta Water Agency, 306 F.3d at 950.

21          The cases relied upon by plaintiffs are distinguishable and, indeed, demonstrate the

22  inadequacy of plaintiffs' evidence.  In Central Delta Water Agency, the individual plaintiff

23  farmers challenged the Bureau of Land Management's decision to release water from a

24  reservoir during certain months.  The farmers alleged that the Bureau's water release plan

25  was highly likely to cause the salinity of the water to exceed certain state requirements, and,

26  because the farmers use the water to irrigate their crops, the farmers alleged that their ability

27  to grow those crops would be hampered by the excessively saline water.  306 F.3d at 947.

28         The Ninth Circuit held that plaintiffs had submitted evidence sufficient to create at

least a genuine issue of material fact as to injury in fact, that is, as to "whether they suffer a substantial risk of harm as a result of the Bureau's policies." Id. at 948. The evidence of the substantial risk of harm was the Bureau's own report which determined that the water release plan would cause the saline requirements to be violated at least one month a year in 41 percent of the next 71 years and that the majority of those excessive saline months were projected to occur during plaintiffs' peak irrigation months. Id. at 948. The plaintiffs also submitted reports documenting the negative effects of increased salinity on the crops that the plaintiff farmers grow. Id. at 949. There was also evidence that the plaintiffs' crops were damaged in the past due to high salinity in the water. Id.

Here, there is no evidence from which a reasonable trier of fact could find that the EPA's alleged failure to implement the ESTP poses a "substantial risk of harm" to plaintiffs. Plaintiffs have not submitted any evidence that any pesticides at their current tolerance levels create harmful endocrine effects in humans; the whole purpose of the ESTP is to determine if they do, to what extent, and for which pesticides. In Central Delta Water Agency, in contrast, the plaintiffs produced evidence that the government's action would, in fact, increase the salinity of the water used by plaintiffs for irrigation, and evidence that such increased salinity would, in fact, damage the plaintiffs' crops. Such specific evidence is missing here.

Plaintiffs' reliance on a recent decision from this court, Levine v. Johanns, 05-04764 MHP (N.D. Cal. September 8, 2006), is also unavailing. In Levine, the plaintiffs challenged the USDA's current policy regarding the slaughter methods of poultry and exotic animals. The policy allows such animals to be slaughtered inhumanely. The plaintiffs alleged that the inhumane slaughter practices increase the risk of bacterial contamination leading to increased risk of food-borne illnesses in consumers; indeed, they specifically alleged how such practices increase the risk of bacterial contamination. Sep. 8, 2006 Memorandum and Order at 3.

The court held that plaintiffs had sufficiently alleged an "actual or imminent" injury because they sufficiently alleged a credible threat of harm from consuming animals that had

United States District Court

For the Northern District of California

9

been inhumanely slaughtered. Id. at 11, 14.  The credibility of plaintiffs' allegations was derived from studies demonstrating that inhumane methods of poultry slaughter increase the level of bacterial contamination. Id. at 14.   The court repeatedly noted, however, that the case was "at the pleading stage," id. at 11, 15, and that it  "falls at the outer limits of injuries that a plaintiff may allege for Article III standing." Id. at 14.

This case, unlike Levine, is not at the pleading stage: plaintiffs may not rest on allegations in their complaint but instead must come forward with admissible evidence establishing a genuine issue of material fact as to the standing elements.  See Central Delta Water Agency, 306 F.3d at 947.  As is explained above, there is a paucity of such evidence; at most, plaintiffs refer to a scientific article that posits that chemicals found in pesticides *may* case harmful endocrine effects in humans.  This is not evidence from which a reasonable trier of fact could find that plaintiffs have demonstrated a substantial likelihood of injury, or a credible threat of harm, from the EPA's failure to implement the ESTP, even putting aside the uncertainties as to whether the EPA would ban any particular pesticide or adjust its tolerance levels.  If Levine "falls at the outer limits" of standing, this case, which is at the summary judgment stage, is beyond the limits of Article III standing.

Second, plaintiffs have not submitted evidence sufficient to create a genuine dispute as to a causal connection between their alleged injury and the EPA's alleged failure to implement the ESTP.  Plaintiffs' failure on this element is related to their failure to prove injury in fact.  Since plaintiffs have not identified any particular pesticides that they contend have an unreasonable endocrine effect at current tolerance levels, they have not established that the EPA's failure to implement the ESTP has placed plaintiffs at a risk of harm.  In Levine, in contrast, the plaintiffs made specific allegations that, if proved, demonstrated that the USDA's policy of allowing the inhumane slaughter of chickens placed plaintiffs at a risk of contracting disease.

Third, plaintiffs have also not satisfied the redressability element of standing.  Even if the Court were to order the EPA to immediately implement the testing process (assuming, for the sake of argument, that it has not already begun implementation), such an order would

10

United States District Court

For the Northern District of California

1   not alleviate plaintiffs' alleged injury: ingestion of foods treated with what plaintiffs believe

2   are harmful pesticides.  There is no evidence in the record that supports a finding that if the

3   EPA began the testing program it would conclude that certain pesticides have an

4   unreasonable endocrine effect at their current tolerance levels and would therefore ban the

5   pesticide or modify its tolerance levels in food.  Nor is there evidence that if the EPA

6   implemented the ESTP, consumers, such as plaintiffs, would be able to make informed

7   choices about what foods to eat.  As the district court for the District of Columbia noted in a

8   case involving farmers' and manufacturers' standing to challenge the EPA's alleged failure

9   to implement the ESTP, the Act "does not confer a broad, legally enforceable right to

10  information." American Farm Bureau v. EPA, 121 F.Supp.2d 84, 99 (D.D.C. 2000).

11  "Section 408(p) does not require EPA to share the results of the endocrine disruptor

12  screening program with the public.  The only report that the agency is statutorily required to

13  prepare is a report to Congress after the program has been in effect for four years." Id.

14          In sum, plaintiffs' standing evidence has too many missing links to pass

15  constitutional muster.  Congress did not give consumers a private right of action to enforce

16  the FQPA.  And the Court cannot find, based solely on Congress's enactment of the FQPA,

17  that plaintiffs are substantially at risk of harm because they eat unidentified foods treated

18  with unidentified pesticides.  Accordingly, the EPA's motion for summary judgment based

19  on lack of standing must be granted.

20  **B.      The NRDC's Motion to Intervene**

21          The NRDC's motion to intervene is dismissed as moot as the NRDC seeks to

22  intervene only on the issue of remedy.

23                              **CONCLUSION**

24

25          At oral argument plaintiffs suggested that if they do not have standing then no

26  consumers have standing to challenge the EPA's alleged failure to implement the ESTP.  The

27  Court's ruling is not nearly so broad; rather, plaintiffs have failed to meet their summary

28  judgment burden to come forward with evidence which, at a minimum, creates a genuine

1  dispute as to whether they satisfy the injury in fact, causation and redressability elements of

2  standing.  Accordingly, the EPA's motion for summary judgment is GRANTED.

3      **IT IS SO ORDERED.**

4

5  Dated: October 20, 2006

6      CHARLES  R. BREYER
       UNITED STATES DISTRICT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28